**UNITED STATES of America,**
**Plaintiff,**
v.
**John Anthony LUCIDO et al.,**
**Defendants.**
**Crim. No. 49234.**

United States District Court,
E. D. Michigan, S. D.
March 22, 1974.

Geoffrey A. Anderson, U. S. Dept. of Justice, Detroit, Mich., for plaintiff.

Albert Summer, Detroit, Mich., Charles Burke, Livonia, Mich., Neil C. Williston, Detroit, Mich., Vernon L. Alger, Warren, Mich., Philip A. Gillis, Detroit, Mich., for defendants.

### OPINION

FREEMAN, District Judge.

The nine defendants in this case were charged in a two-count indictment filed June 14, 1973 with violating 18 U.S.C. § 1955 and conspiracy to violate that section, in violation of 18 U.S.C. § 371. 18 U.S.C. § 1955 provides that "(w)hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both." The three motions now before the court seek to suppress a wiretap order dated May 8, 1972 and an extension order of June 5, 1972 and the evidence obtained thereby. Various grounds in support of these motions have been advanced. Defendants North and Jablonski have joined in the motions of the other defendants, as well as having filed their own motions.

### I

The motions of defendants Bakatselos, Tsakiris, McNeil, Pavleas (deceased) and Lucido contend that the five-day progress reports required by the wiretap orders were not filed. Attached to the Government's response are copies of these progress reports and an affidavit stating that since the presentment of the originals of these reports to Judge Damon Keith, they have been kept under the custody and control of the Federal Bureau of Investigation and the Detroit Strike Force. The court is satisfied that the reports were filed as required and that there is no merit to the contentions concerning these reports.

### II

The same defendants also contend that their motions should be granted because

the Government failed to serve them with an inventory of the wiretaps and pen registers within the requisite time limit as provided for in 18 U.S.C. § 2518(8)(d). This section provides in pertinent part as follows:

> Within a reasonable time but not later than ninety days after the * * * termination of the period of an order or extensions thereof, the issuing * * * judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory * * * On an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed.

By order dated June 5, 1972, the original wiretap order of May 8, 1972 was extended to June 15, 1972. Under the terms of § 2518(8)(d), the inventory would have had to be served no later than September 13, 1972, unless postponed by a judge. On September 15, 1972, the Government obtained a sixty-day postponement from Judge Keith and according to the affidavit of Geoffrey Anderson (Exhibit AA), Judge Keith was informed that the inventory was overdue due to an oversight. By the terms of the order of postponement, the inventory was to be served on November 15, 1972. According to Exhibit AA, on December 11, 1972, the Government became aware that due to oversight and inadvertence, the inventory had not been served. On that day, the Government applied for and received an order to serve the inventory from Judge Keith. The inventories were finally served on December 12, 1972.

In United States v. LaGorga, 336 F. Supp. 190 (W.D.Pa.1971) the court was faced with a similar contention. The pertinent facts of that case are as follows:

> On August 24, 1970 Judge Gourley allowed an extension of 90 days within which to file the inventory with respect to the interceptions under the Order of May 19, 1970. On November 24, 1970 another period of 90 days was granted because the investigation was continuing and disclosure of the wiretaps would have been damaging. On December 23, 1970 an Order was entered requiring that a copy of the inventory be served upon certain named individuals and the record shows that this was accomplished by certified mail on December 24, 1970, and within the time allowed.
>
> With respect to the interception of March 8, 1970 (which order authorized the wiretap for a maximum of 15 days), a 90 day extension was granted on June 18, 1970; a second one on September 15, 1970; and an Order of December 23, 1970 required that the inventory be served. This was done by registered mail on December 24, 1970, some nine days after the date required by the extension of September 15, 1970.

With regard to the Order of May 19, 1970, simple arithmetic demonstrates that the second postponement was received two days after the inventory should have been served pursuant to the August 24th 90-day extension. As the court noted with regard to the Order of March 8, 1970, the inventory was served nine days late. Thus, the *LaGorga* case concerned both of the types of tardiness presented in the case at bar: (1) Receiving a postponement after the date the inventories were required to be served; and (2) serving the inventories after the last due date.

The *LaGorga* court denied the defendants' motion to suppress and made the following remarks:

> It is apparent that there was some confusion regarding the due date of the various inventories. There is no suggestion that an Order requesting a further delay to December 23, 1970 with respect to the March 8 interception would have been denied. No prejudice has been shown by any of

the parties to the delay of a few days in issuing the notice to those concerned. This is not a situation as in United States v. Eastman, 326 F. Supp. 1038 (M.D.Pa.1971) where a suppression order was entered because there was a complete and deliberate failure to file any inventory.

The purpose of the notice is obviously to prevent Government abuse and continuing secrecy on the use of wiretaps. In this case, the Court approved the extensions requested upon valid grounds and in due course the inventories were served. The purpose of the requirement, therefore, has been met and to suppress the evidence on the basis of a clerical oversight having no prejudicial effect would be to unnecessarily undermine and subvert the legislation.

█ The *LaGorga* case is quite similar to the case at bar and this court believes that here, as in *LaGorga,* suppression is not called for. See also, United States v. Wolk, 466 F.2d 1143 (8th Cir. 1972); United States v. Smith, 463 F.2d 710 (10th Cir. 1972); United States v. Cafero, 473 F.2d 489 (3rd Cir. 1973); and United States v. Iannelli, 477 F.2d 999 (3rd Cir. 1973).

### III

█ Another ground for suppression advanced in defendant Lucido's motion is that "the interceptions continued long after the communications described in the application were received over the phones involved in the order of interception." The court believes that this ground lacks merit and notes that the court orders permitting the wiretaps specifically state that the tap was not to automatically terminate when the type of communication described in the application was first obtained.

### IV

Defendant Lucido also contends that "the order authorizing the interception of wire communications fails to state the location of the telephone bearing number 585–5245" as required by 18 U. S.C. § 2518(4)(b). This contention is without merit as both the orders and the application state the location of this telephone number.

### V

A further ground advanced in support of Lucido's motion is that the application for interception was not authorized by the Attorney General as required by 18 U.S.C. § 2516. The authorization was signed by Richard Kleindienst, the "Acting" Attorney General. Defendant apparently contends that as Mr. Kleindienst was only the Acting Attorney General he had no authority to authorize a wiretap application under § 2516.

█ This contention was considered and rejected by Judge DeMascio of this court in United States v. Leon, Criminal #48080 (E.D.Mich. Memorandum Opinion decided June 7, 1973). Judge DeMascio pointed to 28 U.S.C. § 508(a) which provides that "in case of a vacancy of the office of the Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office. * * *." This court agrees that § 508 encompasses the authority to authorize wiretap applications. (This contention of defendant Lucido should be distinguished from the contentions of defendants North and Jablonski, who argue that Mr. Kleindienst had no authority to authorize the wiretap application because of the provisions of 5 U.S.C. § 3348).

### VI

The final contention of Lucido is that (t)he affidavits supporting the application for authorization and the application for extension do not establish probable cause; do not contain a full and complete statement as to whether other investigator (sic) procedures have been tried and failed or why they reasonably appear to be unlikely to succeed; nor is there any basis for the order permitting interception to continue beyond first obtaining the

**1146**

type of communication described in the application.

The contention that a statement of other investigative techniques is missing from the application is without merit. Such a statement is included in the application and is in compliance with the requirements of 18 U.S.C. § 2518(1)(c). Likewise, the application complies with § 2518(1)(d) as to the basis for continued interception.

This court notes that the contention that the application for the May 8, 1972 wiretap and the June 5, 1972 extension lacked a showing of probable cause was raised in United States v. Bourgeois, Criminal #48456 (E.D.Mich., Memorandum Opinion decided November 21, 1973). In that case, Chief Judge Fred W. Kaess ruled that probable cause existed.

In support of his contention that there was no probable cause, defendant Lucido complains that the affidavits are voluminous and contain much irrelevant matter; that there was no basis for believing the identified telephone numbers were used in a gambling operation, and that there was no basis for believing that at least five people were engaged in the gambling operation.

■ This court agrees that the applications were voluminous and also agrees that some of the data could have been omitted. However, as long as probable cause existed in the application as a whole, it does not avail the defendant that some of the data was irrelevant and that the Government placed a great burden on the issuing judge. This court will not assume that because of the bulk of the application the issuing judge did not make, or was not capable of making, a finding of probable cause based on the relevant data. If the court were to order suppression based on the factor of length, it would place an onerous burden on the Government to guess at the line between too little information and too much. This would not serve the interests of justice.

■ This court has carefully reviewed the applications, as did the court in *Bourgeois,* and concludes that probable cause did exist to support the issuance of the wiretap orders. Without attempting to list all of the data leading to a conclusion of probable cause, the court notes the following information was contained in the application:

*Re 6121 Doremus, #s 921–5386 and 923–9199*: (1) Previous wiretaps clearly demonstrated probable cause to believe that an individual identified as "Bill" was involved in an illegal gambling operation. Bill was observed by Government agents going to the Doremus address on a daily basis. (2) A Government agent made a pretext phone call to 921–5386 and a voice identified as "Bill's" answered the call. A second phone rang and "Bill" then answered that call. (3) "Informant 1" told Government agents on August 30, 1971, that four or five "large Metro bookies" employed four "hole men" at the Doremus telephones. (4) "Informant 1" told Government agents April 18, 1972 that he had observed people placing illegal bets by calling the Doremus numbers.

*Re 32420 Dolly Madison, #s 585–7678 and 585–5245*: (1) Previous wiretaps clearly demonstrated probable cause to believe that Glenn Bourgeois was involved in an illegal gambling business. (2) On April 24, 1972 "Informant 2" told a Government agent that Bourgeois was taking sports action at the Dolly Madison numbers. (3) On April 28, 1972, a Government agent was present when "Informant 2" dialed telephone number 585–5245 and asked for Glenn. He was told that Glenn could be reached at that number after 5:00 P.M. (4) On May 1, 1972, "Informant 2" told a Government agent that during the period of April 28 through May 1, 1972 he had contacted Glenn at number 585–7678 to settle his account. (5) On April 27, 1972, "Informant 4" told a Government agent that he had placed bets as recently as April 28 and 29, 1972 by calling 585–7678 and 585–5245. (6) On April 25

and 29, 1972, Government agents observed Glenn Bourgeois entering the Dolly Madison address and on April 26, 1972 they observed Bourgeois' car enter the Dolly Madison apartment complex.

This court believes that the shown reliability of the informants' tips met the standard of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and could be considered as support for the conclusion that probable cause existed, notwithstanding the staleness of the August 30, 1971 tip from "Informant 1." See Chief Judge Kaess' opinion in United States v. Bourgeois, supra. As regards probable cause, the court is not concerned with the fact that the tips were given to an agent other than the one making the affidavit in support of the wiretap application.

This court is also in agreement with the opinion in *Bourgeois*, supra, that the application contained probable cause to believe that five or more persons were involved in the gambling operation. As noted in the memorandum opinion of this court dated January 31, 1974 in this case, this court believes that only customers are excluded from the five person count. See *United States v. Becker*, 461 F.2d 230 (2nd Cir. 1972). During oral argument on this motion, counsel for defendant argued that the most that could be shown from the affidavit is that one bookie was laying off bets with another and that this constituted an accommodation rather than a business relationship. But see *United States v. Ciamacco*, 362 F.Supp. 107 at 111 (W.D.Pa.1973) where the court stated:

> Defendants' contention that the evidence showed several separate businesses involving less than five persons, rather than one business involving at least five persons, is, likewise, devoid of merit. It is well established that all participants in the operation of an illegal gambling business, except customers placing bets, are conducting that business for purposes of § 1955. (citations omitted) By engaging in

his numbers lay-off business, Levine made it possible for persons maintaining an account with him, such as the defendants, to spread their risk of loss and insure the solvency of their operations; thus Levine's business was a necessary and indispensible part of any business which the defendants operated. While the defendants would be more aptly categorized as independent contractors rather than agents vis-a-vis the Levine business, all the people having accounts with Levine interrelated their private business with his in such a manner that they can, with reason, be deemed participants in his business.

## VII

The final contention before the court is made by defendants North and Jablonski. They ask that the evidence obtained through the wiretaps be suppressed because at the time Richard Kleindienst authorized the wiretap applications he was without authority to do so.

The facts pertinent to this contention are as follows: On February 15, 1972, John Mitchell announced his resignation as Attorney General effective March 1, 1972. On the same day, President Richard M. Nixon submitted Deputy Attorney General Richard Kleindienst's name to Congress as his nominee for Attorney General. On March 1, 1972, the effective date of Mitchell's resignation, then Deputy Attorney General Kleindienst assumed the duties of the Attorney General. On June 8, 1972, the Congress of the United States confirmed the President's nomination and Mr. Kleindienst was sworn in as Attorney General on June 12, 1972. The two wiretap authorizations by Mr. Kleindienst which are in issue were signed on May 8, 1972 and June 5, 1972.

5 U.S.C. § 3345 provides as follows: When the head of an Executive department or military department dies, resigns, or is sick or absent, his first assistant, unless otherwise directed by the President under section 3347 of

**1148**

this title, shall perform the duties of the office until a successor is appointed or the absence or sickness stops.

5 U.S.C. § 3348 provides that

(a) vacancy caused by death or resignation may be filled temporarily under section 3345, 3346 or 3347 of this title for not more than 30 days.

28 U.S.C. § 508(a) provides that

(i)n case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose of § 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General.

It is the defendants' contention that Mr. Kleindienst assumed the position of Acting Attorney General by operation of 5 U.S.C. § 3345 and that due to 5 U.S.C. § 3348, his authority to authorize wiretap applications ceased 30 days after he assumed the position and thus the wiretap authorizations in this case are invalid as they were issued after the thirty-day period had expired. The government advances three arguments in opposition to this contention: (1) They claim that Mr. Kleindienst assumed the role of Acting Attorney General by operation of 28 U.S.C. § 508(a), not by 5 U. S.C. § 3345, and that the thirty day time limit of 5 U.S.C. § 3348 is limited to vacancies filled under the Vacancies Act and is inapplicable to succession under 28 U.S.C. § 508(a). (2) Even if the thirty-day limit applied in this case, Richard Kleindienst, as the occupant of the office of Attorney General pursuant to § 508(a), was the *de facto* Attorney General whose acts were valid until his approval by Congress. (3) If the above arguments fail, the government argues that the authorization by Acting Attorney General Kleindienst beyond the thirty day time limit is not the type of "unlawful police conduct" which justifies the drastic remedy of suppression. A fourth argument which was only casually mentioned in the government brief, but more fully developed at oral argument is that the thirty day time limit applies only to the time within which the President must send a name to Congress for confirmation.

This court inquired of Government counsel whether this issue had been previously litigated, and the court was informed that the issue has been raised only in a case for a declaratory judgment that Solicitor General Robert Bork was without authority to exercise the duties of Attorney General because he served as Acting Attorney General for more than thirty days before the President submitted the name of a nominee to Congress. Senator William Proxmire v. Robert H. Bork, Civil Action #2148–73. This action is still pending in the United States District Court for the District of Columbia. After searching for similar cases, this court is satisfied that this precise issue has not been raised before, other than in the *Proxmire* suit.

■ Although the Government has raised several issues, this court need not decide them all at this time, for it is satisfied that assuming *arguendo* that the Vacancies Act applies to the office of Attorney General, the wiretap authorizations in this case were valid.

By its own terms, § 3348 applies only to those vacancies filled under sections 3345, 3346 or 3347 of Title 5. As quoted above, § 3345 provides for the filling of a vacancy of the head of an Executive or military department by operation of law. § 3346 provides that

(w)hen an officer of a bureau of an Executive department or military department, whose appointment is not vested in the head of the department, dies, resigns, or is sick or absent, his first assistant, unless otherwise directed by the President under section 3347 of this title, shall perform the duties of the office until a successor is appointed or the absence or sickness stops.

Under both §§ 3345 and 3346, no action by the President or anyone else is required before the vacancy is filled. §

3347 provides an alternative method of filling the vacancies mentioned in §§ 3345 and 3346:

> Instead of a detail under section 3345 or 3346 of this title, the President may direct the head of another Executive department or military department or another officer of an Executive department or military department, whose appointment is vested in the President, by and with the advice and consent of the Senate, to perform the duties of the office until a successor is appointed or the absence or sickness stops. This section does not apply to the office of Attorney General.

§ 3347 is particularly notable as it specifically does not apply to the office of Attorney General and one must ask why this sentence was included in this section and not in § 3345 if, as the Government contends, § 3345 does not apply to the office of Attorney General.

These three sections are the only ones to which § 3348 applies and 5 U.S.C. § 3349 provides that

> (a) temporary appointment, designation, or assignment of one officer to perform the duties of another under section 3345 or 3346 of this title may not be made otherwise than as provided by those sections, except to fill a vacancy occurring during a recess of the Senate.

The sections speak of the vacancy being filled until a successor is appointed or the absence or sickness ceases. § 3348 applies to these sections only when there has been a death or resignation, that is, when the vacancy will be permanent unless a successor is appointed. The vacancies filled by §§ 3345, 3346 and 3347 are temporary and the authority to act ceases at the end of 30 days or the appointment of a successor. One question which is raised in this regard is what is meant by appointment? Has a successor been appointed when the President sends a name to Congress for approval or when the Senate confirms the nomination? Article 2, Section 2, Clause 2 of the Constitution of the United States provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint * * *" This language would indicate that the "appointment" is not made until after the Senate confirms the nomination. This interpretation makes sense since otherwise the first assistant's authority to act in the vacant position would cease as soon as a name was sent to Congress. But there is no provision which would allow anyone else, including the appointee, to assume the duties before the nomination was confirmed. (If there were such a statute, the problem at hand would be easily solved: Mr. Kleindienst would have taken the duties of Attorney General pursuant to such statute, and not by operation of either Title 5 or Title 28, and § 3348 would not apply to him.) Conversely, if the appointment is not made until after confirmation, by the terms of §§ 3345, 3346 and 3347 only the person assuming the duties under these sections has the authority of the position, including the nominee. And in the case of the Attorney General, only the first assistant has the authority of the position. Thus, if the 30 days runs out prior to Senate confirmation, the post remains vacant.

In Williams v. Phillips, 360 F. Supp. 1363 (D.D.C.1973), four senators brought suit to remove the Acting Director of the Office of Economic Opportunity (OEO) because he had not been appointed by the President and confirmed by the Senate as Director of OEO as required by statute. The defendant Phillips had previously held the post of Associate Director for Program Review of the OEO, a post not subject to Senate confirmation. Upon the resignation of the Director, Phillips was appointed Acting Director by the President and the retiring Director signed a delegation of powers to him. No provision was made for the appointment of an Acting Director in the Economic Opportunity Act of 1964.

The plaintiffs alleged that the only authority to fill the vacancy was in the

Vacancies Act: 5 U.S.C. §§ 3345–3349. However, such succession would be subject to the 30-day limitation of § 3348 and hence the plaintiffs argued, after the 30-day period expired the defendant was serving unlawfully.

In response, the defendant raised two arguments: "first, that the President has the constitutional power to appoint officers of the United States without Senate confirmation deriving from his obligation to 'take Care that the Laws be faithfully executed;' and, second, that the Vacancies Act is inapplicable on its face to the Director of OEO * * *"

The court implied that the Vacancies Act was not facially applicable to the Director of OEO, but stated that this did not answer the question of the legality of the appointment. If not by the Vacancies Act, by what authority did the defendant serve? Citing Ex Parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1880) and two opinions of the Attorney General the court concluded that there was a strong indication that

> in the absence of repeal of a statute vesting an appointment outside the nomination and confirmation process, that process is the exclusive means for appointing federal officers. 360 F. Supp. at 1368.

The court also rejected the argument that the President had a direct constitutional power to appoint officers temporarily without restriction to offices not subject to the Vacancies Act. While not foreclosing the possibility that such a power existed in emergency situations, the court found that such a situation did not exist in the case before it. However, the court did note that there would be constitutional problems to overcome in finding such power of appointment.

In rejecting the plaintiffs' argument that the Vacancies Act should be construed to apply to all Executive agency temporary appointments, the court noted that Congress had provided for the filling of vacancies in other positions which were not subject to the Vacancies Act.

Thus, the failure to provide legislation for an acting director was regarded as intentional and the process of nomination and confirmation was essential.

The holding of the court apparently left the office of Director of OEO vacant.

In the case at bar, only the Deputy Attorney General had the authority to exercise the duties of Attorney General. Since there had been no Senate confirmation of a permanent replacement for John Mitchell, Richard Kleindienst as Deputy Attorney General assumed the duties on March 1, 1972, pursuant to the provisions of 5 U.S.C. § 3345 (and for purposes of the definition of "first assistant", 28 U.S.C. § 508(a)) regardless of the fact that his name had been sent to the Senate for confirmation. But his authority under § 3345 ceased thirty days later, pursuant to § 3348. Once this period expired, looking only to Title 5, the office was vacant. And absent any statutory authority of appointment, the office would remain vacant until either a temporary or permanent replacement was nominated and confirmed. It is at this point that 28 U.S.C. § 508 comes into play.

§ 508 provides that the Deputy Attorney General may exercise the duties of the Attorney General in case of a vacancy in that office. There is no provision in this section for the termination of such authority, except, implicitly, the filling of the vacancy by nomination and confirmation. Thus, under both 28 U.S.C. § 508 and 5 U.S.C. § 3345, the Deputy Attorney General assumes the duties of the vacant position.

§ 508 specifies that the Deputy Attorney General is the first assistant for purposes of § 3345. The Government argues that only § 508 applies to the office of Attorney General. This argument does not explain why § 3345 does not contain such a provision and why § 508 mentions § 3345 if § 3345 is not relevant to the office. The defendants, on the other hand, argue that only § 3345

applies to the succession to office of Attorney General and that § 508 is merely 'definitional.' However, this argument does not explain why Congress felt it to be necessary to include the first phrase of § 508, since it only reiterates the provision of § 3345, rather than just say that "for the purpose of section 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General."

■ This court believes that there is a way to reconcile these positions and give meaning to both sections of the Code. When possible, a court should construe statutes covering the same subject matter so as to give effect to both. Rawls v. United States, 331 F.2d 21 (8th Cir. 1965).

When the thirty-day limit under the Vacancies Act expired, Richard Kleindienst no longer had the authority to act as Attorney General under § 3345. But during that thirty-day period, he had retained his position of Deputy Attorney General. 5 U.S.C. § 5535(a) lends support to this proposition:

> (a) An officer may not receive pay in addition to the pay for his regular office for performing the duties of a vacant office as authorized by sections 3345–3347 of this title.

Thus, when the 30-day period expired, Richard Kleindienst still held the position of Deputy Attorney General and as of this date there was a vacancy in the office of Attorney General. By the terms of 28 U.S.C. § 508(a), the Deputy Attorney General assumes the duties of the Attorney General when there is a vacancy in that office. Thus, as of March 31, 1972, Richard Kleindienst assumed the duties of Attorney General pursuant to 28 U.S.C. § 508(a).

The language of § 508 differs from that of § 3345 in one significant respect: § 508 speaks of any vacancy while § 3345 speaks of specific reasons for the vacancies. Thus, § 508 applies to a vacancy caused for any reason, including the expiration of the thirty-day limit of the Vacancies Act.

Admittedly, if Congress wanted to insure that there would never be a vacancy in the office of Attorney General they could have simply stated that § 3348 did not apply to the office of Attorney General. But they did not do so and they did provide for the filling of vacancies in § 508. It is perfectly plausible that the Congress was concerned about the possibility of a lengthy vacancy in the office of Attorney General. Many duties vital to the everyday functioning of the Justice Department are exercised by the Attorney General, which duties may not be delegated to another official on the resignation of the Attorney General and obviously not delegable upon his death. But at the same time the Congress remained concerned about its constitutional responsibility to advise and consent. Thus, they retained some of the impetus for the President's sending a name to the Senate in a timely fashion rather than allowing a "temporary" Attorney General to serve indefinitely. In this regard it is important to note that the purpose of 5 U.S.C. § 3348 was carried out in the instant case as Mr. Kleindienst's name was sent to the Senate for confirmation even before he assumed the duties of Attorney General. Had the President been dilatory in sending a name to Congress, perhaps a different situation would be present.

For the above stated reasons, the defendants' motions for suppression of evidence obtained through the May 8, 1972 and June 5, 1972 wiretaps are denied.